## The Vesta.

*(District Court, D. Massachusetts.   February, 1881.)*

1. CHARTER-PARTY—GOOD SEA RISK.
> A vessel was chartered for the transportation of wheat in bulk under a warranty that she should be tight, staunch, and strong, and in every way fitted for the voyage.   *Held*, under the circumstances of this case, that it was essential that the vessel should be a good sea risk for the merchandise specified as cargo.—[ED.

*Shattuck, Holmes & Monroe*, for libellant.

*L. S. Dabney*, for respondent.

NELSON, D. J.   The libellant, being the charterer of the Russian bark Vesta, then on her way from Friedland to Delaware breakwater, by a charter-party dated October 22, 1879, rechartered her to the respondent for a voyage from Boston to either of certain specified ports in the United Kingdom and on the continent of Europe.   By the terms of the charter-party the respondent engaged to provide and furnish to the vessel a full and complete cargo of wheat $\frac{and}{or}$ Indian corn.   The libellant engaged that the vessel should prepare for bulk $\frac{and}{or}$ bag grain at her expense; that she should be tight, staunch, and strong, and in every way fitted for

such voyage, and should receive on board the merchandise mentioned. It was also provided that, should the vessel not be at Boston on or before January 15, 1880, the charterer was to have the option of canceling the charter-party. The lay days were to commence when the vessel was ready and prepared to load bulk grain, and written notice thereof given to the charterer. The Vesta arrived in Boston about January 1st, and, having been prepared to load bulk grain, the master, on January 15th, gave written notice to the respondent that she was then ready to receive her cargo, and the lay days would begin to run on the 16th. The respondent at that time owned a cargo of wheat in the elevator at East Boston, which he desired to ship to Europe, and the bark was taken round to the elevator wharf to receive the wheat in bulk. Before proceeding to load, the respondent attempted to procure insurance on the cargo of wheat, but the risk was declined by all the companies to whom he made application; the reason for the refusal assigned by the underwriters being that the vessel was old and built of soft wood. The respondent then declined to load the vessel, claiming she was unseaworthy and not fit to perform the voyage. The question to be decided is whether, under the circumstances of the case, he was justified in so doing.

The rule of law applicable to the case seems to be well settled. The obligation of the libellant under this charter-party was to supply a vessel reasonably fit to carry for this particular voyage a reasonable cargo of any of the kinds of merchandise stipulated for. The charterer was entitled to have the vessel in a reasonable condition for the carriage of wheat in bulk across the Atlantic ocean in the winter months, and if she was not in such a condition he was not bound to load her. *Stanton* v. *Richardson,* 7 L. R. C. C. P. 421; S. C. 9 L. R. C. C. P. 390; S. C. 33 L. T. 193.

Shipmasters of great experience were called on both sides to give their opinion as to the fitness of the vessel for the voyage. The circumstances of the case seem to confirm the opinions of those called by the respondent, who pronounced the Vesta unfit to carry wheat in bulk across the Atlantic

in the winter months. Wheat in bulk is one of the most dangerous kinds of cargo a vessel can carry, owing to its liability to shift in heavy weather, and to choke the pumps. The Vesta was built of soft Norway pine. The voyage was to be in the months when storms are the most frequent and severe. She was rejected by the underwriters as an unsafe risk, and on this account was useless to the charterer for the purpose for which she was chartered. In the export grain business wheat is usually sold to arrive. Bills are drawn against the cargo upon the consignees abroad, payable in London, to which are attached the bill of lading, the certificate of loading, and the insurance certificate. Upon this security advances are obtained upon the cargo. Without the insurance certificate the bills would be of no value for this purpose, and the exporter would be deprived of his advance, which is one of the necessities of the business. The charterer would certainly have acted more wisely if he had insisted upon a stipulation in the contract that the vessel should be a good sea risk for the merchandise specified as cargo. But the impressive fact remains that no insurance company could be found, after reasonable search, that was willing to assume the risk of this voyage under the circumstances stated. To require the charterer to load such a vessel would be a hardship which these parties could not have contemplated when this charter-party was signed. It should be noticed that neither of the parties had ever seen this vessel, or knew anything of her condition, until she arrived in Boston.

The libellant insists that the efforts of the respondent to obtain insurance were not sincere, and his purpose was to escape from his contract on account of the fall in freights which took place after the charter-party was signed. This, however, is not proved. The wheat market was also falling, and it was for the interest of the respondent to get his wheat to market as soon as possible. I am quite satisfied he made all reasonable effort to get insurance.

It appeared that, later in the season, the Vesta was loaded with a mixed cargo of wheat and Indian corn, in bulk, at this port, which she carried and delivered in good condition at an

European port, and insurance was obtained on this cargo. This is certainly a circumstance in favor of the vessel; but, upon all the evidence, I am of opinion the libellant's warranty was broken, and the respondent was justified in refusing to load the vessel. The respondent's allegation that he was induced to sign the charter-party by the fraudulent representations of the libellant is clearly not proved.

Libel dismissed, with costs.