EDDY et al. v. NORTHERN S. S. CO.

NORTHERN S. S. CO. v. EDDY et al.

(District Court, E. D. Michigan. January 5, 1897.)

1. CHARTER OF LAKE STEAMERS—CONSTRUCTION OF CHARTER—CLOSE OF NAVIGATION.

By charter dated October 16, 1894, the charterers agreed to pay $2,700 for every east-bound cargo, from the head of Lake Superior to Buffalo, which the steamer "might be able to carry between the date above specified to the close of navigation for the season of 1894." There being nothing to show that this freight was exceptional, *held*, that the charter contemplated that the owners should furnish west-bound cargo; that the charter was to terminate at the time fixed by custom for the close of navigation, viz. November 30th; and that, having arrived at Buffalo on the last trip November 24th, so that she could not possibly unload and load another cargo before the 27th, the steamer was under no obligation to attempt another trip.

2. SAME—CLOSING OF LAKE NAVIGATION—USAGE—MARINE INSURANCE.

The fact that, of late years, policies of marine insurance for vessels on the Great Lakes, have been made to expire on December 5th instead of November 30th, as formerly, has not impaired the recognized usage whereby navigation is considered as closed on the latter date.

3. PAROL EVIDENCE—MARITIME USAGE—CLOSE OF LAKE NAVIGATION.

Parol evidence of a usage whereby lake navigation is considered as closing November 30th each year is admissible to show the termination on that date of a charter which requires the vessel to carry as many cargoes as she can between the date of the charter and the "close of navigation for the season."

This was a libel in rem by Charles A. Eddy and others against the Northern Steamship Company, alleged to be due under a charter party. The respondent filed a cross bill to recover damages for alleged breach of the charter party by the libelants.

John C. Shaw and H. D. Goulder, for libelants and respondents in cross libel.

Norris Morey, for respondent and cross libelant.

SWAN, District Judge. The original libel in this cause was filed to recover the sum of $2,700 and interest, claimed to be due the libel-

ants, as owners of the steamship Selwyn Eddy, for freight, as per charter party, on a cargo transported from Duluth, Minn., to Buffalo, N. Y. The following is the charter party set forth in the libel:

"This agreement entered into this 16th day of October, 1894, between Northern Steamship Company, party of the first part, and John Shaw, manager steamer Selwyn Eddy, party of the second part. It is hereby agreed that the party of the first part shall pay to the party of the second part twenty-seven hundred ($2,700) dollars, free of handling and loss and damage claims, for each and every east-bound cargo that the said steamer Selwyn Eddy might be able to carry between the date above specified to the close of navigation for the season of 1894; cargoes to be furnished by Northern Steamship Company, and carried from head of Lake Superior to Buffalo. It is further understood that this agreement has nothing whatever to do with any west-bound cargoes. Such cargoes, if any, are to be provided for by said John Shaw, manager. It is also further understood that the party of the first part shall pay to the party of the second part twenty-seven hundred (2,700.00) dollars for each trip, upon delivery of freight at completion of each trip. This agreement executed in duplicate.

"[Signed]                              Northern Steamship Company,
                                           "By John Gordon, Gen'l Mgr.,
                                           "By F. P. Gordon.
                           "John Shaw."

Under this contract the steamer Selwyn Eddy, from about the 16th day of October until November 26th, transported for the Northern Steamship Company from the head of Lake Superior to Buffalo, N. Y., the cargoes furnished by the Northern Steamship Company. Freight was duly paid upon each of said cargoes at the agreed rate, except the last, which was delivered at Buffalo November 24th, in time for unlading that day. This required from 24 to 36 hours, according to the testimony of the charterer's agent, Gordon. The time required for a round trip from Buffalo to Duluth and return to Buffalo was, at that season of the year, 11 days. As is manifest from its terms, the charter party gave the owners of the Selwyn Eddy the right to procure and transport west-bound cargoes, and contemplated that the owners would avail themselves of this privilege for their own benefit. The proofs make it clear that one or two days would be required to procure and load a west-bound cargo for the Eddy. With the utmost expedition in loading and unloading, the Eddy could not have departed from Buffalo before November 27th, had there been no delay in procuring a west-bound cargo. Foreseeing that the steamer could not discharge her cargo, procure and lade another, and complete a round trip, until the 6th or 7th of December, even if the conditions of weather and temperature should be favorable, the owners of the Eddy contracted for the carriage of a cargo for other parties from Escanaba to Buffalo, and declined to venture another trip to the head of Lake Superior. The Northern Steamship Company thereupon demanded of the master of the Selwyn Eddy that upon the unlivery of his cargo, November 25th, he should make another trip to Duluth for another cargo, under the charter. This the master of the steamer, acting under the instructions of her owners, refused to do, unless the charterer would guaranty the safety of the vessel. The owners of the steamer claimed that she had fulfilled her obligations under the charter, and that the conditions of navigation on Lake Superior were

such as made it reasonably certain that the steamer would not be able to make the trip, owing to the lateness of the season; insisting also that under the charter the obligations of the steamer expired on the 30th day of November, which, according to the usage of lake commerce from time immemorial, has been accepted as the close of the season of navigation. The proofs are full and satisfactory that 95 per cent. of all the vessels engaged in lake commerce are laid up by the 1st of December; that time being regarded by the usage of the lakes as the limit of safe navigation. Indeed, the difficulty of obtaining a steamer to take the place of the Eddy and make the trip her owners refused to make arose from the general observance of this usage by steamship owners, who had either chartered their vessels for winter storage, or laid them up for the season. The steamers of the Northern Steamship Company itself were, with one or two exceptions, laid up before the Eddy's last trip was completed. The proofs also show that a few vessels take the hazards of running beyond that time when conditions seem favorable, induced doubtless by high freights, but such trips are exceptions which prove the rule. There is nothing in this record to show that the freights under the charter sued upon were exceptional or unusual. It is a fair inference from this fact, and from the provisions of the charter, that the steamer was to carry only east-bound cargoes, while her owners were to furnish the west-bound loads, and, from the recognized perils and expense attending ice-obstructed waters, that neither party had in mind extraordinary risks, or intended to contract for their compensation. It clearly appears that upon the last trip of the Eddy to Duluth, and on her return therefrom, she encountered much ice, and all indications pointed to an early actual close of navigation upon that lake. It is true that the steamer Globe, after the declination of the Eddy to make another trip, succeeded in making the voyage and returning to Buffalo with an east-bound cargo; but this was unusual, and was compensated by a corresponding increase of freight money, viz. $6,000, or more than double that agreed to be paid to the Eddy. Two or three other steamers also are shown to have reached Buffalo after the 4th or 5th of December of that year. The navigation of Lake Superior during the latter part of November and early in December, when feasible, is beset by perils not incident generally to the navigation of Lakes Michigan, Huron, and Erie, and their connecting waters, and is attended with unusual expense, because of the necessity of employing tugs to break the ice, and the delays caused by ice and storms; the testimony being that the lower lakes are often navigated for two weeks after commerce has ceased on Lake Superior. Not the least of the dangers of voyages to Lake Superior ports is the freezing over of the St. Mary's river, and the closing of the harbors at the upper end of the lake. For many years the term of policies of marine insurance upon the lakes has been expressly limited to expire upon the 30th day of November, at noon, which has been accepted as the limit of safe navigation in the opinions of underwriters and mariners as well. Voyages extending beyond the 1st day of December have been permitted by insurers upon special terms and increased premiums. Of late years the term of the policies has been extended to noon of December 5th, but

it may be fairly stated that this allowance has not impaired the recognized usage of the lakes that the season of navigation closes with November 30th, and manifestly does not extend that season.    The parol evidence establishes, beyond doubt, the universality and force of this usage; and it must be taken to be a well-recognized incident of every contract for lake transportation, where the terms of the charter do not expressly otherwise provide.    Contracts for maritime service "for the season of navigation" are held to terminate November 30th of each 'year.    The Balize, 1 Brown, Adm. 424, Fed. Cas. No. 809.    The parties to the charter under consideration must be deemed to have contracted with reference to this usage.    It would be unreasonable to hold, in the absence of a provision indicating a different purpose, that the owners of the steamship and the charterer, in view of the freight stipulated for in the terms of the contract, had in mind any extension of the obligations of the vessel beyond the customary period of navigation.    The charterer itself, as early as October 25, 1894, by its general freight department circular of that date (libelant's Exhibit B), declined to receive at Eastern points freight for transportation after certain dates, and limited the receipt of shipments at Buffalo, as follows:

"It is now expected that the last sailings from Buffalo will be on Saturday, November 17. All freight must be in Buffalo, and ready for delivery to our steamships, not later than Friday, November 16th.
      "[Sgd.] .                              Stewart Murray, General Freight Agent.
    "Approved: John Gordon, General Manager."

Consistently with this notice, the charterer usually laid up all of its own steamers between November 15th and 20th (Gordon's deposition), although the Northwind succeeded in making a trip after the refusal of the Selwyn Eddy.    When the hazards of navigation, by reason of the obstructions and perils incident to later navigation, become extraordinary, and, in all human probability, insuperable, the vessel is not to be held for a breach of contract for declining to take upon herself those perils, nor are the owners answerable for refusing to run their vessel until further progress is made physically impossible by ice.    It is contended on behalf of the respondents that a different meaning should be attached to the phrase, "the close of navigation for the season of 1894," from that which would be given to the charterer had the language used been, "until the close of the season of navigation of 1894."    It is impossible to see any purpose in the phrase used in the charter party differing from that which would have been expressed had the latter words been the language of that instrument.    They are equivalents in every particular.    The construction sought to be placed upon the charter by the respondents would require that the steamer should be run to Duluth until the actual physical close of the navigation of the lakes.    This seems to me strained and unnatural, and I find in the charter nothing to indicate a purpose by either party to disregard the usage of the trade, or bind the other to extraordinary undertakings or obligations.    The parol evidence referred to above was objected to at the hearing as tending to contradict the contract. On the contrary, however, it is entirely consistent with that instru-

ment, and was therefore admissible for the purpose offered. Bradley v. Packet Co., 13 Pet. 89, 100; Hostetter v. Park, 137 U. S. 30, 11 Sup. Ct. 1; Myers v. Walker, 24 Ill. 138; U. S. v. Peck, 102 U. S. 64. There is no merit in the defense, and a decree must be entered for the libelants for the sum of $2,700, with interest and costs from November 26, 1894. As the rights of the cross libelant are rested entirely upon an erroneous construction of the obligations of the charter party, the cross libelant is not entitled to recover the $6,000 paid for the services of the Globe, and the cross libel must be dismissed, with costs.