OADES et al. v. PFOHL et al.

(District Court, W. D. New York. November 16, 1900.)

No. 3,843.

SHIPPING—BREACH OF CHARTER—INABILITY TO INSURE CARGO.

It was a condition of a parol charter of a sailing vessel to carry a cargo on the Great Lakes that the charterers should be able to procure insurance on the cargo. Owing to delays, the vessel did not arrive at the port of loading until November 14th, some two weeks after the time her agent had stated she ought to arrive, and, by reason of the fact that navigation by vessels of her class was considered extrahazardous at that season of the year, the charterers were unable to insure her cargo, and they refused to load her. They applied to but a single agency in Buffalo for insurance, but such agency represented a number of companies, and did a large business in marine insurance. It appeared that the charterers acted in good faith, and they paid a higher rate of freight for the carrying of the cargo by a larger vessel, which enabled them to effect insurance thereon. *Held*, that they were not liable for damages for a breach of the charter.

In Admiralty. Suit for breach of charter.

Harvey L. Brown, for libelants.
Potter & Wright, for respondents.

HAZEL, District Judge. This case in personam is brought by the libelants, owners of the sailing vessel Ganges, to recover $345.51, damages sustained by them on account of the breach of the charter party entered into by the libelants and respondents. The libelants contend that on or about October 24, 1898, the respondents chartered the schooner Ganges to carry a cargo of pig iron from the port of

Manistique, Mich., to the port of Buffalo, at the freight of one dollar per ton, free of expense to the vessel; that is, without expense to the vessel for loading or unloading her cargo. The contract of charter was made with one Boland, who had special authority to contract for the carriage by the Ganges of 620 tons, her carrying capacity, of pig iron, of which respondents were the owners. The respondents contend that the charter of affreightment was dependent (1) on the condition that the cargo of pig iron, if loaded on the vessel, could be insured; (2) that the respondents reserved the right to charter a boat to take 1,241 tons of pig iron, of which they were the owners, and which was on wharf at Manistique, if a vessel could be secured for that purpose, unless the chartering agent found another vessel to take the balance of the pig iron, which the Ganges could not load. The conditions of the charter party, testified to by one of respondents, are denied by the chartering agent, except that he admits there was talk in reference to insurance on the cargo. On that point, when his attention is called thereto, on cross-examination, he says, "Mr. Pfohl, as I remember, said he would take the vessel if he could get insurance;" and at another part of his cross-examination he says, in answer to a question in regard to the insurance, "I don't exactly recollect, but I recollect him [respondent] mentioning the fact that if he could get insurance he would take the boat." The concession by the broker of libelants that at some time during the negotiations for the charter there was talk about insurance, and the testimony of the witness Pfohl, that in the first conversation had on the subject of the charter he inquired of Boland whether the cargo on the Ganges would be insurable, and that Boland replied in the affirmative, are corroborative of respondents' testimony that the question of insurance on the cargo—whether it could be obtained, no limit of time being specified—was part of the conversation that led to making the charter party by parol. I therefore hold that a condition of the charter party was that insurance on the cargo could be obtained. The question of respondents' inability to obtain insurance on the shipment after November 1st is important. The question naturally arises, did the respondents make reasonable and timely effort to obtain insurance on the cargo to be shipped on the Ganges after November 1st? What duty in that regard, and in the light of all the circumstances, did the respondents owe to the libelants before they could be relieved of their obligations created by the contract? The charter party was entered into on or about October 24, 1898. The season of navigation on the Great Lakes closes on or about December 5th of each year. The Ganges was a sailing vessel, and her carrying capacity was 620 tons. She was rated in the Inland Lloyd's as class A2, and the insurance for that class of vessels ended on the 30th of November. It appears from the testimony of Mr. Davis that it is doubtful if any insurance agent in Buffalo would take the risk on the Ganges after November 1st. The evidence shows that respondents applied for insurance on the pig iron about the middle of October, and that afterwards the underwriter was informed that the vessel was on her way with the cargo. With that explanation the risk was accepted. Subsequently the underwriter was informed that the boat

was not loaded,—that she was not on the way,—and he then stated to respondents that he would not insure the cargo after November 1st; that the Ganges at that period of the year, because of her class and her value of $4,000, was a transient and extrahazardous risk. No further effort was made by respondents to obtain insurance for the shipment, but on November 12th they procured a charter of the tow barge Scotia, a vessel of class A2, valued at $22,000, a larger and better vessel than the Ganges. Insurance on the cargo of pig iron was obtained from the underwriters who had refused to take the risk of the Ganges' cargo. November 14th the Ganges arrived at Manistique, having been greatly delayed by boisterous weather and adverse winds, and by time consumed in repairing a broken masthead. She left Buffalo on October 20th, laden with coal to Harbor Springs, a port distant about 24 hours' sail from Manistique. She was sheltered at Long Point until the 28th, and arrived in Huron on the 29th. She reached Lake Huron on the evening of November 2d, and on the 3d sailed to Sand Beach. Left there on the morning of the 5th, and arrived at Harbor Springs on the 9th. Unloaded her cargo of coal, and left Harbor Springs for Manistique, the morning of the 13th, arriving at that port on November 14th.

It is not claimed that any part of the delay in the arrival of the vessel in Manistique was attributable to her fault, or that it was caused to any extent by her negligence. There is evidence in the case that the chartering agent, at the time charter party was made, in answer to an inquiry of respondents, said she ought to arrive at Manistique in about a week. It is not urged that this statement was a condition of the charter, or that the contract of affreightment depended upon the arrival at a specified time of the vessel at Manistique. The statement made by the agent Boland, that she ought to arrive in about a week, cannot be considered as a condition precedent, nor is it apparent from the evidence in this case that it was a substantive part of the contract. I am of the opinion, however, that the charter of the Ganges was dependent on the condition that insurance for the freight could be procured.

Proctor for libelants contends that no such diligence was used to procure insurance as will relieve respondents from their contractual obligations; that, it not being shown that respondents endeavored to procure insurance of any other insurance agent or broker, they are estopped from now urging their inability to obtain insurance as a reason for absolving them from liability for breach of the charter party. I am unable to satisfy myself of the soundness of this contention; nor can I, from the evidence in the case, draw any inference which will point to that conclusion. The inferences deducible from the evidence show, or, at least, indicate, such efforts to procure insurance on the pig iron by the respondents as were reasonably diligent, in the light of existing facts. The lengthy delay of the Ganges on her voyage to Manistique was unexplained at any period of time between October 24th, when she left Buffalo, and her arrival at her place of destination, on November 14th. Her return trip, at that late season of the year, was to be at a time when storms on the lakes are most frequent and severe. The underwriters to whom application

for insurance was made represented at least three marine insurance companies, and evidence is undisputed that they conducted an extensive marine insurance business in 1898,—as large, if not larger, than any other agent in the city of Buffalo. All of the parties concerned knew of the perils of lake navigation in the month of November. Respondents' frequent inquiry of Mr. Boland as to when the Ganges would arrive to take on the pig iron is strong evidence of their anxiety to have their property speedily brought to its objective point. It is clear that insurance was rejected on the cargo as an unsafe risk, and therefore respondents were justified in seeking other vessels to carry their merchandise. It was apparent to them that insurance was not obtainable, and it was not obligatory on them at that season of the year to do more than make application for insurance in good faith to a marine underwriter engaged in the business of accepting marine risks. But respondents did more. Repeated conversations were had with the underwriters, and it was only on the approach of November 1st, and when no reason was assigned for the vessel's delay, that insurance was refused. The prevailing general custom to decline transient and extrahazardous risks at that season of the year is well known to those who engage in the business of navigating the lakes, and owners of vessels accepting shipments on the Great Lakes must be presumed to have knowledge of the common custom of insurance companies regarding rates and increased risks towards the close of the navigable season. To require the charterer to load a vessel when no insurance is obtainable would be a hardship which these parties could not have contemplated when the charter party was signed. It was so held in The Vesta (D. C.) 6 Fed. 534.

The record does not show that the respondents were actuated by any other motives than to avoid the risk of loss through their inability to obtain insurance on the cargo; and it is not contended that the insurance underwriters had any motive for declining to accept this risk, other than the lateness of the season, and the added perils and hazards of navigation arising therefrom. It is held that "a vessel is not liable for breach of contract for declining to take upon herself those perils by reason of the obstruction and perils incident to later navigation." Eddy v. Steamship Co. (D. C.) 79 Fed. 364. Applying that rule to this case, in the light of the evidence, how can it be said that the respondents did not do all that ought to be required of them at that season of the year? The contract of affreightment must be construed in furtherance of the intention of the parties. I have no difficulty in finding that the conversation had between Boland and Pfohl on the subject of insurance was a substantial and material element of the contract. The letter in evidence, written by Boland to Pfohl, dated October 20, 1898, stating that he could give the schooner Ganges for cargo at $1 per ton free, and making no reference to any conditions, does not disturb the impressions which I have of the facts. There were other conversations in regard to the charter, both before and after writing the letter. In the view I take of the case, any other alleged conditions of charter need not be discussed, except that the payment of $1.25 per ton to the Scotia for transporting the merchandise, being 25 cents more than it was agreed should

be paid to the libelants, is strongly corroborative of respondents' anxiety to have the shipment speedily brought to its port of discharge. Respondents in their answer aver that they sustained damages by reason of the failure of libelants to perform the agreement of charter, and that they were put to great expense, and were compelled to charter another vessel to transport their property, at an increased rate of freight. No cross libel was filed, and I do not understand that any claim for damages is urged. In any event, no recovery will be decreed against the libelants. Decree dismissing libel may be entered.