## THE INDRAPURA.

(District Court, D. Oregon. December 18, 1916.)

### No. 4757.

1. CUSTOMS AND USAGES ☞15(1)—APPLICATION AND OPERATION—EXPLANATION OF CONTRACT.

While a custom or usage is never admissible to contradict, or to control or vary, the positive stipulations of a written contract, it has a proper and well-settled office and function in trade to ascertain and explain the meaning and intention of parties to contracts, whether written or parol, where this cannot be done without the aid of extrinsic evidence.

[Ed. Note.—For other cases, see Customs and Usages, Cent. Dig. §§ 30, 31, 33; Dec. Dig. ☞15(1); Evidence, Cent. Dig. § 1946.]

2. SHIPPING ☞125—LIABILITY FOR LOSS OF CARGO—DEVIATION—EFFECT OF CUSTOM AND USAGE.

The going into dry dock in Hong Kong of a steamship with part of a cargo on board, which had been transshipped to her under through bills of lading, where it was in accordance with the general custom of the port, was a customary incident of the voyage, and not a deviation which rendered her or her charterer liable for loss of cargo while in the dry dock.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 459, 460, 466; Dec. Dig. ☞125.]

3. INSURANCE ☞314—MARINE INSURANCE—CAUSE OF LOSS—DEVIATION—EFFECT OF CUSTOM AND USAGE.

Such act of the vessel, being customary, and not a deviation, did not affect the right of the charterer to recover on a policy insuring its freight.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 722–737; Dec. Dig. ☞314.]

In Admiralty. Suit by the British & Foreign Marine Insurance Company, Limited, against the Portland & Asiatic Steamship Company, the steamship Indrapura, the Indrapura Steamship Company, Limited, claimant, in which the Oregon-Washington Railroad & Navigation Company intervened. Decree for respondents, and on cross-libel for the Portland & Asiatic Steamship Company against libelant.

Andros & Hengstler, of San Francisco, Cal., for libelant.

Bauer & Greene and A. H. McCurtain, all of Portland, Or., for the Indrapura and Indrapura S. S. Co.

Arthur C. Spencer and C. E. Cochran, both of Portland, Or., for Portland & Asiatic S. S. Co. and Oregon-Washington R. & Nav. Co.

WOLVERTON, District Judge. What has previously been determined on exceptions to the libel in this case I find no occasion for

amending or modifying. By averment in the libel it appears that the steamship Indrapura was put in dry dock without maritime necessity therefor. Controverting this averment, two of the respondents answer that it is true the Indrapura was put into dry dock with a partial cargo on board, but that this was done in pursuance of a usage and custom which was general as to the port of Hong Kong and the ports of the Orient and of the world, and that such usage and custom, as it respects the port of Hong Kong, has its basis upon the conditions that prevail and have prevailed for a great length of time relating to the shipment and transshipment of cargo. The sole question that now arises is, what effect such usage and custom, if it exists, has as it respects the bills of lading or the policy of insurance of freight by the British & Foreign Marine Insurance Company. This question is not dominated in the least particular by the former opinion of this court on the exceptions to the libel.

Pertaining to the question of fact as to whether the alleged usage and custom exists, I am persuaded that it does, and that it has so existed for a long period of time as it relates to the port of Hong Kong; but the proofs are inadequate to show that it exists in the Orient generally or in other ports of the world. It was the common practice in the transshipment of cargo for ships to discharge in the stream upon lighters, and then reload from the lighters into ships for carrying the cargo forward on the voyage. There are other means of discharging cargo for transshipment, namely, by discharging on wharves, or "godowns," as they are called, such cargo being taken from these places of deposit for carriage to destination; but the transshipment is generally accomplished through means and by use of lighters, as above indicated. The facilities for placing vessels in dry dock at the port are or were at the time inadequate for prompt service, and vessels were required to bide their turn when found convenient and necessary that they should go into dry dock.

Shortly prior to the docking of the Indrapura in the present instance, she had come into port from Portland with cargo. This she had unloaded. Immediately prior to going into dry dock, she took on from lighters a partial cargo, consisting of jute and gunnies, some 200 tons in weight, and some other light materials. She had been in dry dock, the third engineer says, six months before, but the captain says about February, 1902, which would have been nine months before; the charter party requiring that she be docked at least every six months. For two or three reasons it was necessary that she go into dry dock again: One, to have her hull scraped and painted; another, that her British passenger license had expired, and, according to the requirements of the British Board of Trade, a survey was necessary before issuing a new passenger certificate; and, still another, that a Lloyd's survey was required at the time for her proper classification before proceeding on her voyage back to Portland.

Although the captain objected to taking the cargo on board before docking, even to the extent of protesting, for the reason that he "did not care about accepting the responsibility of inflammable cargo being on board of the ship any longer than necessary," Mr. Allan Cameron,

the general agent for the Portland & Asiatic Steamship Company, directed him to proceed, and he did so. Cameron denies that there was definite objection on the part of the captain to taking on the partial cargo; but in this it appears he is mistaken, for the chief officer supports the captain's statement. Cameron's reasons for taking on the cargo before docking were that otherwise storage elsewhere would have been necessary, and the ship would have been subjected to charges therefor.

Now, as to the usage and custom. A number of reliable witnesses, all of whom were in position to know whereof they deposed, have testified to its existence at the port of Hong Kong at the time and for many years prior thereto. These consist of Armsden, the chief engineer of the Indrapura, Hollingsworth, the captain, and Cameron, the general agent of the Portland & Asiatic Steamship Company; also of Raphael Solomon Judah, of the Colony of Hong Kong, and head of the shipping department of David Sassoon & Co., Limited; Charles Adolphe Henri Westerburger, shipping manager in the firm of Arnhold, Karberg & Co.; Charles Montague Ede, general manager of the Union Insurance Society of Canton, Limited, and of the China Traders' Insurance Company, both marine insurance companies; Edbert Ansgar Hewett, superintendent in Hong Kong of the Peninsular & Oriental Steam Navigation Company; Douglas William Craddock, general traffic agent to the Canadian Pacific Railway Company; Frederick Joseph Halton, agent of the Pacific Mail Steamship Company; and Thomas Arthur, a member of the firm of Goddard & Douglas, marine surveyors, and surveyors to practically all the local insurance companies.

True, some of these witnesses testify respecting the practice of their own companies, such as Judah, of David Sassoon & Co., and Craddock, of the Canadian Pacific Railway Company; but their testimony is strongly corroborative of the general practice and custom prevailing at Hong Kong, as unequivocally asserted by the other witnesses. The question propounded to these witnesses as to the custom was somewhat stereotyped, and perhaps called for a conclusion, and not the fact; but subsequent questions succeeded in bringing out in a fair way the real conditions and practice prevailing at Hong Kong. The reason generally given for such dockage with partial cargo is very well exemplified by the answer of Judah, as follows:

"It is much safer, so far as cargo is concerned, to dry-dock the vessel with so much cargo as she may happen to have on board, as much less risk of damage by breakage, loss, theft, bad handling, fire, and rain is run by following this course than if the cargo were unloaded. This course saves double handling and its attendant risks, and it also saves the great danger of open lighterage, with its great risk of damage by fire and water. Insurance companies run less risk of loss when cargo is taken into dry dock than when it is unloaded."

From all this testimony I am firmly persuaded that in November, 1902, and for many years prior thereto, a general usage and custom existed and prevailed at the port of Hong Kong for vessels to go into dry dock with partial cargo, for the purpose of survey, and for cleaning and painting the hulls, and for ascertaining whether they were seaworthy to enter upon further voyages.

[1] Custom and usage to be available for any purpose should be well defined and established by clear and convincing proofs, so that henceforth there can scarcely be a doubt of its actual existence. Such, however, I deem to be the effect of the proofs here adduced. It is never proper to resort to any usage or custom to control or vary the positive stipulations of a written contract, nor, a fortiori, in order to contradict them. The Reeside, 20 Fed. Cas. No. 11,657; De Witt v. Berry, 134 U. S. 306, 312, 10 Sup. Ct. 536, 33 L. Ed. 896.

But, while usage or custom is never admissible to subvert settled rules of law, nor to contradict, modify, or explain that which is plain and unambiguous in contracts, it nevertheless has a proper and well-settled office and function in trade, which is to ascertain and explain the meaning and intention of parties to contracts, whether written or parol, where this cannot be done without the aid of extrinsic evidence. Such evidence is admissible on the theory that the parties knew of the custom or usage when they entered into contractual relations, and presumably contracted with reference to it. Barnard v. Kellogg, 10 Wall. 383, 19 L. Ed. 987; Robinson v. United States, 13 Wall. 363, 20 L. Ed. 653. Hence it was said in Hostetter v. Park, 137 U. S. 30, 40, 11 Sup. Ct. 1, 4 (34 L. Ed. 568):

"It is well settled that parties who contract on a subject-matter concerning which known usages prevail incorporate such usages by implication into their agreements, if nothing is said to the contrary."

This case had its origin in an alleged deviation, the facts being, as found by the Circuit Court, from which the appeal was prosecuted, that the towboat Iron Mountain, having in tow several barges, among which was Ironsides No. 3, with partial cargo aboard, left Pittsburg, bound for New Orleans, and arrived safely at Mt. Vernon, Ind. At that point the towboat detached from her fleet Ironsides No. 3, and proceeded upstream to certain piles, where some corn was taken aboard. From there the barge was towed across the river, and took on corn at two landings on the Kentucky side; the second being what was known as Whitmon's Landing. While backing out from Whitmon's Landing the barge sank, with total loss of cargo. The respondents justified their action in detaching the barge and proceeding to other points on the ground that it was in accordance with the usage and custom of trade and navigation on the Ohio and Mississippi rivers. The usage and custom being proven, this was sustained as a valid defense to the deviation alleged by the libel.

The case of Marx v. National Steamship Co., 22 Fed. 680, is instructive. The steamer Euphrate took a cargo at Marseilles for New York to be transshipped at London, "in and upon the steamship called the Canada, * * * and, failing shipment by said steamer, then by other steamer, or following steamer of this line, for which the goods shall arrive in time." The Euphrate having arrived too late to meet the Canada, and there being no other ship of that line to arrive within 22 days, the cargo was forwarded by a boat of another line, aboard which it was lost. It was shown at the trial that it was usual and customary, when goods were received at London to be dispatched by a through bill of lading, to forward them by steamer of some other line

in case the goods were likely to be detained upwards of a week beyond the next usual sailing day. Judge Brown, in construing the bills of lading, did so in the light of the proven usage and custom obtaining at London, and held the respondent not liable. In the course of his opinion the learned judge has this to say:

"In construing bills of lading, as in construing other commercial instruments, it is the right and duty of the court to look, not only to the language employed, but to the subject-matter, and to the surrounding circumstances, in order to determine the proper effect of the language used, by putting itself, so far as possible, in the place of the contracting parties. It has regard, therefore, to all the prevailing usages and customs of business."

These two cases illustrate very well the true and legitimate application of usage and custom for the interpretation of contracts, and its pertinency for ascertaining and determining whether there has been a deviation in a ship's voyage. It is strongly asserted by the court, in Constable v. National Steamship Co., 154 U. S. 51, 66, 14 Sup. Ct. 1062, 1068 (38 L. Ed. 903) that:

"If such deviation be a customary incident of the voyage, and according to the known usage of trade, it neither avoids a policy of insurance, nor subjects the carrier to the responsibility of an insurer."

The court cites Oliver v. Maryland Ins. Co., 7 Cranch, 487, 3 L. Ed. 414, Columbian Ins. Co. v. Catlett, 12 Wheat. 383, 6 L. Ed. 664, and Hostetter v. Park, supra, in support of the assertion. See, also, Eddy v. Northern S. S. Co., 79 Fed. 361, and The F. J. Luckenbach, 213 Fed. 670, as to the application of proven usage and custom in the interpretation of policies of marine insurance and charter parties.

[2] Now, it is urged with strong emphasis that the bills of lading in the instant case are susceptible of clear construction without resort to the alleged usage and custom respecting dry-docking at Hong Kong, and that, if the ship desired the privilege of going into dry dock with cargo on board, it should have had an express stipulation to that effect. The bills of lading read:

"Shipped * * * on board the steamer * * * now lying in the port of Calcutta and bound for Hong Kong, to be there delivered to the agents of the Portland & Asiatic Steamship Company, to be by them transshipped to the ——— or other of that company's steamers bound for Portland, Or., * * * and being marked as per margin to be carried upon said steamer (with leave to tow and assist vessels in distress; to sail with or without pilots; to transship to any other steamers; to warehouse or lighter from steamer to steamer, and from steamer to shore; and with liberty to call at any port or ports in or out of the customary route in any order), unto the port of Portland, Oregon (acts of God * * * excepted)."

The wording takes no account of dry-docking at the port of Hong Kong, and from the reading it would seem that nothing is left for construction, especially as to the point in controversy. But when we come to consider that there is no deviation, if account is taken of the usage and custom, by placing vessels with partial cargoes in dry dock at that port, we realize that it was not essential that the bills of lading make note of the custom, by way of an exception, in order to permit the dry-docking to be done. The custom allowed it to be done, and it was only necessary to name the ports of beginning and destination of the voyage and the general route to be pursued. In view of the custom, in

so going into dry dock, there was no deviation. Such was the conclusion reached in the case of Hostetter v. Park, supra, where the barge was detached at Mt. Vernon from other barges in tow and taken across the Ohio river to take on cargo on that side; also in the case of Marx v. National Steamship Co., supra, where the cargo was shipped from London on a vessel of another line than that designated in the bills of lading. The things done were in pursuance of a custom and usage, and therefore did not constitute a deviation. Whether it be said that the usage and custom are to be read into the bills of lading, or that such contracts are to be construed with reference thereto, makes but little difference. The real condition was, in view of the custom, a thing with relation to which the parties contracted, that the voyage anticipated, if convenient, the dry-docking of the steamship Indrapura before proceeding on her journey hence from Hong Kong to Portland, Or. As to this, the parties must be considered to have been in accord, and it was not necessary to write it into the contract, because they contracted with reference to its existence. So it is there was no deviation by observing and pursuing the custom.

Some question is raised as to whether the voyage had been begun when the ship was put into dry dock. But the cargo was on its way to Portland, and had been on its way since its shipment at Calcutta; and as to the cargo, there would have been a deviation by placing the ship in dry dock with it aboard, had it not been for the custom allowing and permitting such a thing to be done at Hong Kong while on its voyage to destination.

Another question is made that the custom and usage was not general, and hence not binding on the shipper. As I construe the matter, the custom was general as to the port of Hong Kong—everybody observed it, all ships with partial cargo on board were at liberty to take dry dock in pursuance of it without incurring the irregularity of a deviation, and hence all persons shipping through the port were bound to take note of its existence. The custom was therefore binding on the shipper as well as the carrier, and this whether the shipper lived at the port or at some foreign port. See Marx v. National Steamship Co., supra.

[3] The Portland & Asiatic Steamship Company has interposed a cross-libel, whereby it seeks to recover from the British & Foreign Marine Insurance Company insurance on the freight for carriage of the goods lost. The considerations touching the alleged deviation are as applicable here in favor of the assured, if not with stronger persuasion, as they were to the shipper in the main case. The amount of loss under the policy was $1,225.80.

The decree of the court will therefore be that the libelant take nothing by its libel, and that the Portland & Asiatic Steamship Company recover from the British & Foreign Marine Insurance Company the sum of $1,225.80, and interest thereon at 6 per cent. per annum from July 25, 1903, the date of the final adjustment of general average and the apportionment of the proceeds of the cargo.