## CIRCUIT COURT NO. 2 OF BALTIMORE CITY.

Filed December 3, 1917.

BAUGH CHEMICAL COMPANY OF BALTIMORE COUNTY
VS.
DAVISON CHEMICAL COMPANY OF BALTIMORE COUNTY.

*Frank R. Savidge, W. Irvine Cross* and *Lee S. Meyer* for plaintiff.

*Venable, Baetjer & Howard* for defendant.

DUFFY, J.—

The contract in issue in this case was executed April 28th, 1913; it called for the sale and delivery of from 30 to 50 thousand tons of sulphuric acid a year for five years ending December 31st, 1917. The quality is stated to be "Chamber Acid" 50° to 54° Baume. Baume is the name of a hydrometer. The buyer called at the proper time for the delivery of the maximum amount for each ensuing year and all went well until the general dislocation of commerce by the war. Up to August 1st, last, the seller was in default in monthly deliveries due, it is said, to accidents, etc., but these difficulties were all corrected and its plant is now and has been for some time past running to its full capacity and is making 1,000 tons of acid daily. About 1880 and continuously prior to that year sulphuric acid was made from brimstone. Sometime between 1880 and 1890, after an experimental stage most of the manufacturers of the lowest and cheapest grade of acid, which is the kind called for in the contract, changed from using brimstone to pyrites because it was found to be cheaper. Pyrites is an ore which contains from 45 to 50 per cent. of sulphur. It also contains iron, copper, arsenic and other substances which in the acid trade are impurities, particularly the arsenic; as a consequence of which in the drug trade and in the chemical trade, in which sulphuric acid, free from arsenic, is required, acid made from pyrites is outlawed, and in those lines brimstone acid alone is used because it contains little or no arsenic. But for making fertilizer, the presence of arsenic and the other impurities is of no importance. Pyrites was imported from Spain in large quantities up to 1915. There are mines in Canada and several in the United States, but the Canadian and domestic output are, up to this time, insufficient for domestic consumption.

Since 1915, owing to the diminishing supply of pyrites, manufacturers of acid for fertilizer have been turning again to sulphur as a base. As a consequence the defendant has changed its plant so that it can use either pyrites or sulphur as it finds from time to time the one or the other base the cheaper or otherwise more advantageous. Its plant contains seven sets of burners. In all the sets it has been using brimstone since May last, and it has been using brimstone alone since October 1st, but in sets "A" to "E" it facilitates the burning of brimstone by using cinders from pyrites which makes the acid from these set low grade and contaminated with the arsenic and other impurities from the cinders, so that this acid is less contaminated than if it were made from pyrites and not so pure as the acide made in "F" set, in which brimstone is used without the use of cinders. About six months ago the defendant informed its fertilizer customers that it could not fulfill its contracts because of the scarcity of pyrites and with all of these fertilizer customers, except the complainant, it made supplemental contracts, in accordance with which it is now supplying to some of them this contaminated acid made as aforesaid in sets "A to E" and is receiving a higher price than was called for in the original contracts, although Mr. Huntington says (pp. 944-6) that the market value of this contaminated acid is about the same as that of acid made from pyrites.

To some others it is furnishing acid phosphate made by it with this contaminated acid in lieu of acid called for by the original contracts with them. The complainant refused to make a supplemental agreement and is here insisting on the enforcement of its contract. The defendant notified the complainant in August that it could get no more pyrites, and that it would refuse to fulfill its contract further, and stopped its weekly deliveries. No acid was furnished by the defendant after September 1st, until it was compelled to resume weekly deliveries by the preliminary injunction in this proceeding. The defense set up is that the contract calls for acid made from pyrites and that it is not bound to furnish acid made from sulphur, that it cannot get pyrites in sufficient quantities to enable it to fulfill its contract with the complainant and that is inasmuch as the supply of pyrites from Spain has been substantially diminished by the war, it is relieved by the following provision of the contract: "For accident or strike, in the works of any of the parties herein mentioned; obstruction

to navigation, accident to acid barges, war, insurrection, or other uncontrollable causes rendering buyers unable to receive or sellers to deliver shall be good and sufficient reason to make this contract inoperative during the period of necessary repairs, reconstruction or continuance of difficulties."

In support of this defense, the testimony of several witnesses was offered by defendant that the term "Chamber Acid" in the contract, means in the trade, acid made from pyrites by the Chamber process, and that this was the meaning in 1913 when the contract was made. The witnesses of the complainant are just as positive in their testimony that "Chamber Acid" in the trade means now and meant in 1913, acid made by the Chamber process, whether made from pyrites or brimstone. All of the witnesses who testified on this point do say that the phrase "Chamber Acid" is derived from the fact that in the process which is and always has been used to make low grade acid, a large lead lined chamber is used as a container for the sulphurous gases when they come from the burners. On this point there is no conflict of testimony. The Chamber process has been in existence for perhaps a century. As there are other processes for making acid, for instance the contract process, it is natural and sensible to designate this process as the Chamber process, and the acid thus made as Chamber Acid. Inasmuch as pyrites came into general use in making acid about 1890, there could not have been a trade usage before that date, ascribing to these two words the meaning, to wit: Acid made out of pyrites by the Chamber process. Each witness who testified to this usage seemed credible and positive as to his knowledge on the subject. I cannot account for this divergence of opinion unless it be this, that in the fertilizer trade where acid containing arsenic is in general use the meaning of the phrase is different from what it is in the drug trade which uses only chemically pure acid and in the chemical trade in which acid free from arsenic is used. In making acid for these trades the contract process is used or if the Chamber process is used some additional process is necessary to eliminate the arsenic, and, of course, to guard against impurity brimstone is used because it contains very little arsenic.

But it is not necessary to account for the variance in definition. Because of this variance the defendant's testimony that Chamber Acid means acid made from pyrites by the Chamber process, falls short of proving a usage at all. The most that can be said of this testimony is that it establishes a practice in certain departments of the acid trade.

"A trade usage must be a custom of sufficiently long continuance, that all parties may be presumed to know it, it must be uniform, it must be universal. It does not show a usage of trade to show that many persons or a majority of persons engaged in the business, practice in a particular mode. To constitute a usage of trade, so as to have it affect the contract, the practice must be universal. It must be *the* mode in which persons in that trade do their business." 114 Mass. 110, Porter vs. Hills; 238 Fed. 856, The Indrapura; Phipson, Evidence, p. 88; Brantly, Contracts, 275, 277.

Furthermore, so far as the fertilizer business is concerned, to ascribe to the phrase the meaning which the defendant seeks to give, it is artificial and unreasonable.

(1) Because it is immaterial to the fertilizer manufacturer what base is used for making acid.

(2) Pyrites is not a chemically different substance from brimstone. It is a mixture of pure sulphur to the extent of 45 or 50 per cent. and other materials. It is bought by acid makers by the sulphur unit of contents. The sulphur contents is burned out of it in making acid and what is left is discarded by the acid maker as cinders or refuse.

(3) Any higher grade of acid can be reduced to 50° Baume, and used in the fertilizer business, whether made by the Chamber process or some other.

(4) About 1890 the acid makers changed their base from sulphur to pyrites and since 1915 all the large plants have changed back to sulphur in whole or in part. Owing to present difficulties in obtaining pyrites, extensive sulphur deposits have been developed in Louisiana and Texas, the output being 3,000 tons per day, 60 per cent. of which is used in making acid, and sulphur will continue to be the principal base from which acid is made so long as it continues to be the more available and the cheaper. Thus it

appears that at present far more acid is made by the Chamber process from brimstone than from pyrites. In the defendant's plant only the Chamber process is used and Mr. Huntington says that 90 per cent. of the output is now made wih sulphur.

Mr. Ledoux said that prior to the war there was not competition between brimstone and pyrites as a base for making low grade acid—the latter being much cheaper than the former for the purpose. But the testimony of Mr. Wilkinson as to the very large increase of the output of brimstone from Louisiana and Texas since 1914 makes it clear that after sea transportation becomes normal there will be sharp competition between sulphur and pyrites as the base for making low grade acid, so that if the phrase Chamber acid did shift its meaning after 1890 the new definition of Chamber acid does not now describe the low grade acid made from brimstone for the fertilizer trade.

The contract of April 28th, 1913, was the consummation of negotiations between Mr. Miller for the seller and Mr. Brewster for the buyer, both men had had ample experience in the acid business. Mr. Brewster inspected the defendant's plant as he naturally wished to assure himself that the defendant could furnish 960 tons of acid a week. Both men knew that at that time pyrites alone was being used by the defendant as a base, and that the buyer wanted the acid for making fertilizer, and that in some other plants brimstone was used as a base; under these circumstances, if Mr. Miller really contemplated limiting the base to pyrites in fulfilling the contract, it is strange that he failed to so specify in the contract. No matter who drew the draft which was finally signed by the parties, Mr. Pinkerton testifies that the contract was the result of a long conference between Mr. Miller and Mr. Brewster, in which he participated; the executive officers of both companies must have considered the matter most carefully as it contemplated a selling price of $250,000 a year for 5 years. It contains a suspension clause in case of strikes, war, etc., why was not the failure of the pyrites supply inserted in this suspension clause if that was contemplated by the parties?

Let us now consider the defenses on which the defendant relies. They are:

(1) In a state of stress such as exists at present all that is required of the seller is to use due diligence in an effort to fulfill the contract, and, (2) with the trade definition above mentioned, interpolated in the contract, and with the great difficulty in obtaining pyrites, due directly to the prevention of importations caused by the war, it is entitled to refuse further deliveries until the pyrites stringency loosens up, relying upon the suspension clause in the contract.

At the beginning of the year the defendant had a large supply of pyrites, but after the intensifying of the submarine warfare in March last, the supply imported from Spain gradually fell off, but has not stopped entirely, and at present the importers are more hopeful of shipments from abroad. The defendant in August notified the plaintiff that he could not get any more pyrites and refused to continue complying with the contract. But there is a domestic supply of pyrites and one imported from Canada. These supplies are not large enough for the trade; the evidence also shows that several cargoes have arrived from Spain in the last six months and one or two cargoes are on the way. The testimony further shows that today pyrites in large quantities is being used in the manufacture of Chamber acid.

It thus becomes apparent that the defendant would probably be able to procure pyrites if it would go into the market and bid a sufficiently high price to get it—a price that will be an inducement to those who have pyrites, to give it up and substitute brimstone for it. How much he could get does not appear, but the defendant has refused to fulfill this contract, claiming it cannot get *any*, notwithstanding the testimony in this case that today manufacturers are using it in large quantities.

But apart from this, in a recent case in which the contract contained a clause of exemption in case of war, it has been observed: "No seller can claim exemption if he has failed to protect himself by the requisite covering contracts in a case where it is usual and prudent to do so. A seller cannot choose to take the risks of the market, and then when the market goes against him, claim protection. In such a case he is prevented not by war, but by his own imprudence." Bulckow

vs. Compania Miners, 32 Times Law Rep. 404.

And so in several recent English cases in which the contracts sued on contained suspension clauses, it was held that in order to excuse the defendant it must appear that the *vis major* was a "physical or a legal prevention and not an economic unprofitableness" which has been brought about by the war. L. R. 1 K. B. of 1917, p. 218, Wilson vs. Tennant; 114 Law Times 753, Blythe vs. ————; 114 Law Times 755, Scheepvart, etc., vs. North African Co.; 32 Times Laws Rep. pp. 184 and 202.

The foregoing cases were all suits at law, but the principle, I think, applies as well to a suit for the specific performance of the contract.

But if the trade definition of Chamber acid is adequately proven by the defendant's witnesses and the contract admits the interpretation which the defendant thus seeks to put upon it, nevertheless I do not think the defendant has used due diligence in endeavoring to fulfill its contract. Its original contracts for supplies were with importers of pyrites from Spain. In March last when it was apparent that the supply from Spain was diminishing the Pennsylvania Salt Company, with which it had a contract for large deliveries of pyrites, notified the defendant that no more pyrites would be delivered. It has taken no steps to enforce its contract against the Salt Company, although it knows that that company is a large consumer of pyrites in making acid in its own business. But it made an effort to cover by making an additional contract with the Pyrites Company, Ltd., for 25,000 tons for delivery from March to July, 1917. It has made no effort to cover by purchasing domestic or Canadian pyrites, nor has it made any effort to cover by purchasing acid made from pyrites by others, although large quantities of acid are today being made from that ore.

Surely the defendant's counsel must be in error when he contended in argument that by the terms of the contract the defendant had no right nor was it bound to deliver acid of the specified quality made by some other manufacturer, bought for the purpose of fulfilling this contract. But this is aside from the mark, for it appears from the evidence and from the letter of August 16, 1917, from the plaintiff to the defendant (plaintiff's exhibit 18) that the plaintiff was insistent in its demand for acid and surely must be quite willing to take any that is delivered, no matter by whom made.

Since April the defendant has received 7,800 tons from the Pyrites Company, Ltd., in June, and 3,100 tons from Naylor & Co. in July, and has been notified that a cargo of 8,000 tons is due to arrive in December. Mr. Ledoux, the agent of the Pyrites Company, Ltd., testified that the demand for pyrites is far greater than the supply, but that his company had imported and delivered 50,000 tons to five customers since August 1st last, and in August he made two spot sales, one of 5,000 tons in Wilmington, N. C., and the other 3,000 tons in Savannah. Mr. Mills testified that Naylor & Co. had delivered 25,000 or 30,000 tons in the United States since August 1st last. Several witnesses testified that the plants with which they are connected are operating and using pyrites. For instance, Mr. Stabler said that five of his plants are making 395 tons of acid per day out of it. The defendant has done nothing to avoid a default on this contract except to make the additional contract with the Pyrites Company, Ltd., above mentioned. When we consider these facts in connection with the facts before mentioned, to wit: That defendant is furnishing some of its fertilizer customers with a low grade of acid made from brimstone and is now complying with the mandatory injunction by furnishing the same kind of acid to the defendant and is with this same kind of acid making acid phosphate for other fertilizer customers, it becomes manifest that the defendant is not using due diligence to avoid a breach of this contract, and, further, that the prevention of the defendant is really one of price and not such a physical or legal prevention brought about by the war as will admit of a suspension of the contract in accordance with the above recited suspension clause. There is, I think, a striking analogy between the facts of this case and those in the case of Wilson vs. Tennant, cited above.

The testimony of Mr. Pinkerton makes out a case of irreparable injury for which specific performance of the contract should be decreed. Neal vs. Parker, 98 Md. 266; Equitable Gas Co. vs. Baltimore Coal Tar Co., 63 Md. 285; Pomeroy, Specific Performance, Sec. 15.

The motion to dissolve will be overruled. On application made by complainant's counsel at the argument, the injunction order will be modified so as to make deliveries terminate on the expiration of the contract, December 31st, 1917.

In accordance with the foregoing opinion, it is ordered by the Circuit Court No. 2 of Baltimore City, this 3rd day of December, 1917, that the motion to dissolve the preliminary injunction, be and is hereby overruled. It is further ordered that the injunction order dated September 25th, 1917, be modified to this extent, to wit: That said deliveries until December 31st, 1917, or until the further order of this Court.

Exception to testimony of Ralph I. Miller and Henry F. Baker are overruled.